UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL SHUNOCK,

                          Plaintiff,

          -against-                                      Case No. 1:23-cv-08598 (JLR)

APPLE, INC.,                                             **OPINION AND ORDER**

                          Defendant.

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Michael Shunock ("Plaintiff" or "Shunock") brings this action against Apple, Inc. ("Defendant" or "Apple"), seeking damages and a declaratory judgment that each of his seven asserted design patents is valid and enforceable, that Apple's Activity Rings infringe each patent, and that the alleged infringement is willful. *See generally* Dkt. 1 ("Compl."); U.S. Patent No. D956,802, Dkt. 1-4 (the "'802 Patent"); U.S. Patent No. D956,803, Dkt. 1-5 (the "'803 Patent"); U.S. Patent No. D956,804, Dkt. 1-6 (the "'804 Patent"); U.S. Patent No. D956,805, Dkt. 1-7 (the "'805 Patent"); U.S. Patent No. D956,806, Dkt. 1-8 (the "'806 Patent"); U.S. Patent No. D956,807, Dkt. 1-9 (the "'807 Patent"); U.S. Patent No. D956,808, Dkt. 1-10 (the "'808 Patent") (each, an "Asserted Patent," and together, the "Asserted Patents"). Apple responded to Plaintiff's Complaint with several affirmative defenses, as well as counterclaims for declaratory judgments of non-infringement and invalidity as to each Asserted Patent. *See generally* Dkt. 14 at 1-24 ("Answer"); *id.* at 24-46 ("Countercls.").

Now before the Court are the parties' cross-motions for summary judgment under Federal Rule of Civil Procedure ("Rule") 56, Dkt. 137 ("Pl. Mot.") (moving for partial summary judgment on invalidity); Dkt. 141 ("Def. Mot.") (moving for summary judgment on invalidity and non-infringement), and dueling motions to preclude expert testimony pursuant to Federal

Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Dkts. 145, 147, 154, 157.

For the reasons that follow, Defendant's motion for summary judgment is GRANTED as to non-infringement and DENIED as moot as to invalidity.  The Court likewise DENIES as moot Plaintiff's motion for partial summary judgment and the parties' *Daubert* motions.

## BACKGROUND

The Court draws the following facts from the parties' submissions in support of their respective motions for summary judgment, including the parties' Local Rule 56.1 statements and responses, as well as the parties' *Daubert* motions.  *See* Dkt. 215 ("Pl. Br."); Dkt. 216 ("Pl. SUF"); Dkt. 220 ("JSUF"); Dkt. 240 ("Def. Opp."); Dkt. 174 ("Def. RSUF"); Dkt. 245 ("Pl. Reply"); Dkt. 249 ("Pl. RSUF II"); Dkt. 218 ("Def. Br."); Dkt. 217-1 ("Def. SUF"); Dkt. 166 ("Pl. Opp."); Dkt. 236 ("Pl. RSUF"); Dkt. 251 ("Def. Reply"); Dkt. 252 ("Def. RSUF II"); Dkt. 279 ("Def. Supp. Br."); Dkt. 281 ("Pl. Supp. Resp."); Dkt. 283 ("Supp. Auth."); Dkt. 222 ("Pipe Daubert"); Dkt. 237 ("Pipe Opp."); Dkt. 254 ("Pipe Reply"); Dkt. 224 ("Sun Daubert"); Dkt. 238 ("Sun Opp."); Dkt. 255 ("Sun Reply"); Dkt. 230 ("Rinke Daubert"); Dkt. 242 ("Rinke Opp."); Dkt. 250 ("Rinke Reply"); Dkt. 232 ("Klemmer Daubert"); Dkt. 243 ("Klemmer Opp."); Dkt. 247 ("Klemmer Reply").  The Court also draws the following facts from the declarations of Gary Butcher, Sean Baldwin, and Mark Selwyn, and the exhibits attached thereto.  *See* Dkt. 219 ("Butcher Decl."); Dkt. 227 ("Selwyn Decl."); Dkts. 149, 150, 228, and 229 (each, "Baldwin Decl.");[1] Dkt. 231 ("Baldwin Daubert Decl. I"); Dkt. 253 ("Selwyn Reply Decl."); Dkt. 271

---

[1] The 184 exhibits associated with this declaration were filed across four docket entries; the declaration was refiled each time, with different exhibits attached to each entry.

("Baldwin Daubert Decl. II"); Dkt. 272 ("Baldwin Reply Decl."); Dkt. 280 ("Selwyn Supp. Decl."); Dkt. 282 ("Baldwin Supp. Decl.").

## I.    Factual Background[2]

### A.    The Spread Media Logo

In early 2011, Plaintiff hired third-party designer Kevin Price ("Price") to design a logo for Plaintiff's company, Spread Media, Inc. ("Spread Media").  Def. RSUF ¶ 20.  Price testified at his deposition that the design process was "fairly lengthy" and involved "a lot of back and forth between [himself] and [Shunock]."  Selwyn Decl., Ex. 22 ("Price Tr.") at 4:2-6.  According to Price, the two "explored variations," with Shunock sending over samples "with his thinking" as well as "a reference document" — all of which Price "combin[ed]" and "integrat[ed]" into a final design.  *Id.* at 4:6-19.  The final logo consisted of various staggered, concentric arcs arranged in a sweeping, S-shaped pattern.  *Id.* at 6:19-7:2.  It was completed in or around January 2012.  JSUF ¶ 74.



Baldwin Decl., Ex. 22 ("Spread Logo").

---

[2] "[U]nder Rule 56(c), the Court can consider, among other things, depositions, interrogatory answers, and admissions in deciding a summary judgment motion."  *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 558 (S.D.N.Y. 2021); *see also* Fed. R. Civ. P. 56(c) (providing that party may assert facts by citing to, *inter alia*, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers").

Unless otherwise noted, where only one party's Local Rule 56.1 Statement is cited, the other party either does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

Shunock later retained another third-party designer, Michael Gottschalk ("Gottschalk"), to create a time-based animation of the Spread Logo for potential future use in the Spread Media app, video promotions, and commercials. Baldwin Decl., Ex. 20 ("Gottschalk Tr.") at 74:10-75:12; Def. RSUF ¶ 35. Gottschalk completed the project in late April or early May 2012. Gottschalk Tr. at 73:17-74:9. At the time, Gottschalk was employed at 1K Studios. Def. RSUF ¶ 34.

B.      The Passion Hierarchy and the PCT Application

Following development of the Spread Logo, Shunock and Gottschalk collaborated to design the Passion Hierarchy graphic, Gottschalk Tr. at 146:12-24, which was inspired by the Spread Logo, JSUF ¶ 75; *see also* Selwyn Decl., Ex. 20 ("Shunock Tr.") at 175:9-13 ("Q. What came first, the Spread Media logo or the passion hierarchy? A. The logo.").[3] The Passion Hiearchy used the concentric arcs from the Spread Logo to depict, among other things, varying levels of consumer engagement or interest. Gottschalk Tr. at 80:15-24 (testifying that the concentric arcs in the Passion Hierarchy "were taken from the existing Spread logo" and are "the same size arc tangent lengths [and] color order as from the logo"); *id.* at 107:22-108:8 (testifying

---

[3] In his Complaint, Shunock inexplicably alleged the inverse, namely that he "used the designs from his PCT Application, including Fig. 13's spread illustration [*i.e.*, the Passion Hierarchy], as the basis for the logo of his company, Spread Media, Inc." Compl. ¶ 19.

that the passion hierarchy has "half of the Spread logo with the extended five lines to . . . audience components"); Def. RSUF ¶ 49.



Selwyn Decl., Ex. 52.  Gottschalk testified that, in iterating on the Spread Logo, he made various design choices, including: (1) "how far some of the additional trailing arcs would go," (2) "where text can or cannot exist in that framework," (3) "where the logo type may exist," (4) the font, (5) "how the half transparent [arc] tends to face off to nothingness toward the lower right," and (6) "how we incorporate showing multiple people, in this case, with . . . minimally-styled iconographic figures."  Gottschalk Tr. at 144:12-24.  He further testified that his design process consisted of "discussion" or "briefing from Shunock about what [Shunock] wanted to achieve with th[e] passion hierarchy graphic."  *Id.* at 146:12-24.  However, according to Gottschalk, "the process was . . . minimally iterative," as his initial design required only "a few adjustments or tweaks" before being finalized.  *Id.* at 146:1-7.

Sometime after the Passion Hierarchy was completed, on July 5, 2012, Plaintiff filed International Patent Application No. PCT/CA2012/050454 (the "PCT Application") with the World Intellectual Property Organization pursuant to the Patent Cooperation Treaty ("PCT").  JSUF ¶ 2.  That filing date thereafter became the PCT Application's priority date.  Def. RSUF ¶ 61.  The PCT Application sought a utility patent for a "System and Method for Annotating Images."  Selwyn Decl., Ex. 44.2 at 44.  Shunock, Linda Arhin, Sina Sojoodi, Sherwin Kartick,

and Mark D'Cunha were named as inventors.  JSUF ¶ 60.  The PCT Application included the below illustration, labeled "FIG. 13," to show how the invention "may provide information related to ratings."  Selwyn Decl., Ex. 44.2 at 74; Def. RSUF ¶ 62.[4]



Selwyn Decl., Ex. 45 ("PCT Substitute Images") at 16; *see id.*, Ex. 44.2 at 90.  FIG. 13 depicts the Passion Hiearchy in grayscale.  Def. RSUF ¶ 63.  The PCT Application was approved and published internationally on January 10, 2013.  *See* Shunock PCT at 1.

### C.    Apple Designs the Activity Rings

Beginning in 2013, Apple designers started developing an animated graphical user interface ("GUI") concept for the Apple Watch that ultimately became known as the "Activity Rings."  JSUF ¶ 66; Def. RSUF II ¶ 9.



---

[4] While this version of FIG. 13 was not in the original PCT Application, it was added as a substitute figure during prosecution, JSUF ¶ 61, and ultimately incorporated in the granted PCT patent, Dkt. 1-1 ("Shunock PCT").

6

*See* Baldwin Reply Decl., Ex. 187 ("Activity Rings Patent"); Compl. ¶ 5.  "A GUI is a way to

command a computer operating system using graphic symbols."  *WePay Glob. Payments LLC v.*

*McDonald's Corp.*, No. 22 C 1064, 2022 WL 17279115, at *1 (N.D. Ill. Nov. 29, 2022)

(citations omitted).  A team of Apple designers and engineers worked for many months

exploring different design approaches before settling on a three-ring configuration representing

different fitness metrics.  Def. RSUF II ¶ 9; *see* Def. RSUF ¶¶ 141, 144.  As early as September

2013, Apple designers had created a preliminary iteration of the three concentric rings design:

 

Baldwin Decl., Ex. 55 at 6; Baldwin Daubert Decl. II, Ex. 2 ("Pipe Rebuttal Report") at 260.

Later iterations of the three-ring design included the below January 2014 mockup:



Baldwin Decl., Ex. 73 at 4; Def. RSUF ¶ 171.  That January 2014 design was succeeded by the

following February 2014 design:



Baldwin Decl., Ex. 78 at 6; Def. RSUF ¶ 181.  By February 28, 2014, the design team prepared to hand off the Activity Rings design to the engineering team, which would commence the back-end work on the design while the design team continued to iterate on the Activity Rings as needed.  Def. RSUF ¶ 187.

### D. Plaintiff Seeks Utility Patent Protection and Trademark Registration

On April 9, 2014, Plaintiff filed a national stage entry application, U.S. Application 14/129,132 (the "Utility Patent Application"), pursuant to 35 U.S.C. § 371, with the U.S. Patent and Trademark Office ("USPTO" or "PTO").  Baldwin Decl., Ex. 35 ("Utility Patent Application") at 2; Def. RSUF ¶ 64.  The Utility Patent Application sought domestic patent protection of the claims in the PCT Application, *see* Def. RSUF ¶ 65, and therefore had the same priority date of July 5, 2012, *id.* ¶ 81, and identified the same inventors, Utility Patent Application at 2.  FIG. 13 of the Utility Patent Application is the same as that substituted in the PCT Application.  Def. RSUF ¶¶ 66, 82.  As in the PCT Application, the Utility Patent Application's FIG. 13 is described as "providing an illustration of how passionate each category is about an item or image, in such a way as to 'radiate' from the core of the illustration where the

passion is highest."  Utility Patent Application at 26.  It is further noted that "any number or name of category can be provided."  *Id.*



FIG. 13

*Id.* at 17; *see also* Dkt. 1-11 ("Shunock Utility Patent") at 17.

Later, on May 27, 2014, Plaintiff registered a trademark for the Spread Logo, consisting of "a centrally positioned circle with a plurality of concentric crescents surrounding the central circle."  Selwyn Decl., Ex. 47 ("Spread Trademark") at 8.

### E.    The Apple Watch and Activity Rings Are Announced to the Public

It was not until September 2014 that Apple announced the Apple Watch, and with it, the final Activity Rings design.  *See* Def. RSUF ¶ 7.  On September 2, 2014, Apple filed an application for a design patent related to its Activity Rings design.  *See* Activity Rings Patent at 1.  The Activity Rings interface displays three concentric, circular rings corresponding to the metrics "move," "exercise," and "stand."  Def. RSUF ¶ 14.  The three rings each begin with a unique arrow symbol.  Pl. RSUF ¶ 123.  Additionally, each of the Activity Rings is vertically aligned at approximately 12 o'clock and visually "fills" along a circular track of the same color as the user progresses toward daily fitness goals, providing a summary of activity levels.  *Id.* ¶¶ 122, 124, 130; JSUF ¶ 72.  As the rings progress along the track, their color gradient fill gradually lightens from the beginning of the ring to its endpoint.  Pl. RSUF ¶ 126.  A ring may

eventually overlap upon itself once an activity goal is met, visually conveying that a user has exceeded their goal. *Id.* ¶ 129. Some of the Activity Rings' potential states are depicted below:



Baldwin Daubert Decl. II, Ex. 1 ("Pipe Report") at 188, 195, 217; Compl. ¶ 5.

The Activity Rings are included in the Apple Watch, which first went on sale on April 24, 2015. JSUF ¶¶ 68-69; Answer ¶ 30. The Activity Rings are not, however, pre-activated on the Apple Watch; rather, the Apple Watch must be paired with an iPhone to complete the Watch setup. Pl. RSUF ¶¶ 28-30; JSUF ¶ 71. The Activity Rings may also appear on the Fitness App on certain iPhones that have been paired with an Apple Watch. *See* Pl. RSUF ¶ 25; Def. RSUF ¶ 19; Answer ¶ 43.

### F.    Plaintiff's 2017 Demand Letter and Advice from Counsel

Plaintiff asserts that "[b]eginning in late 2015, shocked by the Activity Rings' [alleged] similarity to his utility patent's [FIG.] 13, Plaintiff asked his then-counsel Bereskin & Parr ("Bereskin"), if he could obtain further protection effective against the Activity Rings." Pl. Supp. Resp. at 1.[5] In June 2017, while prosecuting the Utility Patent Application and drafting a trademark demand to Apple, Plaintiff reiterated his request to Bereskin to identify a "possible claim" against Apple. Baldwin Supp. Decl., Ex. 199; *see* Pl. Supp. Resp. at 1-2. On July 7, 2017, Plaintiff sent Apple a trademark demand letter predicated on the Spread Logo design.

---

[5] In his Complaint, before Plaintiff's correspondence with Bereskin was produced, Shunock instead alleged that he "became aware of Apple's new Activity Ring design and its striking similarity to the Spread Media designs" "[i]n 2016." Compl. ¶ 37.

Compl. ¶ 39; Answer ¶ 39.  In the letter, Plaintiff asserted that the Activity Rings design was similar to his trademarked logo, that he had created his logo in 2012, and that Apple had reason to know about his design because "both parties were involved with the same design and animation studio [*i.e.*, 1K Studios] in 2012."  Compl. ¶ 39; Answer ¶ 39.

Apple, through counsel, responded to Plaintiff's trademark demand letter on August 8, 2017, asserting that Plaintiff had no basis for a trademark-infringement claim.  Compl. ¶ 41; Answer ¶ 41.  Following receipt of Apple's response letter, Plaintiff dropped his trademark infringement demand.  Compl. ¶ 41; Answer ¶ 41.

Shortly thereafter, on August 11, 2017, Bereskin sent Shunock an email memorandum regarding his request to "augment [his] intellectual property to gain protection" against the Apple Watch.  Selwyn Supp. Decl., Ex. 69 ("Shunock Tr. II") at 326:17-20; *see id.*, Ex. 63 (the "Memo").  In the Memo, Bereskin outlines "the most promising approach to take to obtain intellectual property protection that could possibly cover features of the Apple Watch," namely "filing a design application claiming priority to th[e] [U]tility [P]atent [A]pplication."  Memo at 2.  Bereskin advised, however, that a design continuation would likely fail, both because the Utility Patent Application is "likely lacking at least some of the information we would have wanted to include [in a] design application," and because prior art would either "stop [Plaintiff] from obtaining design patent protection" altogether or "narrow the scope of protection [Plaintiff would] receive to the point that it [would] not cover the Apple Watch."  *Id.* at 5-6.  As part of the latter prior art analysis, the Memo included two examples of "prior art" depicting concentric ring designs.  *Id.* at 6.





Selwyn Supp. Decl., Ex. 67 at 2; *id.*, Ex. 68 at 2.

Given his counsel's advice, Shunock "dropped the issue." Pl. Supp. Resp. at 3. However, his interest in the matter was reignited over three years later, in November 2020, when Plaintiff attended "a general lecture about IP protection" led by Bereskin partner Jason Hynes ("Hynes"). Shunock Tr. II at 359:13-360:17. At the time, Hynes "didn't know [Shunock]" and "was unaware of [Shunock's] IP portfolio." *Id.* at 360:1-6. Nevertheless, Shunock testified that "a light bulb went off in [his] head" while listening to the lecture because Hynes spoke about the ability to obtain the same priority date as his Utility Patent Application by filing a continuation design patent. *Id.* at 366:8-21.

### G.    Plaintiff's Design Patents

On August 25, 2021, Plaintiff applied for seven design patents with the USPTO, claiming "[t]he ornamental design for a display screen with graphical user interface, as shown and described." JSUF ¶¶ 3-9. Shunock and Gottschalk were the named inventors in each application. *Id.* ¶ 10. The USPTO granted all seven of Plaintiff's design patents on July 5, 2022. *Id.* ¶¶ 3-9. Each Asserted Patent was granted as a continuation of Plaintiff's Utility Patent Application and therefore, if valid, shares the Utility Patent Application's effective priority date

of July 5, 2012. *See* Def. RSUF ¶ 72; *see* '802 Patent at 1; '803 Patent at 1; '804 Patent at 1; '805 Patent at 1; '806 Patent at 1; '807 Patent at 1; '808 Patent at 1. Moreover, the Notice of Allowability[6] for all but two of the Asserted Patents included an "Examiner's Statement of Reasons for Allowance," which provided the following description of the Examiner's reasoning:

> In the claimed design, the specific size, curvature and position of the segments together creates a unique stylistic effect. The treatment of these features results in a novel design, one that is patentably distinct from the cited prior art. The claim is allowed with the understanding that the specifics of each line, arrangement of lines and overall composition are what makes the design novel. Furthermore, the claim is understood to seek no protection for any deviation of form in any of these lines and composition.

Dkt. 79-13 ("'802 Notice") at 8; Dkt. 79-14 ("'803 Notice") at 8; Dkt. 79-15 ("'804 Notice") at 8; Dkt. 79-16 ("'805 Notice") at 8; Dkt. 79-17 ("'806 Notice") at 8.

In response to the Examiner's statements, Shunock submitted his Comments on Statement of Reasons for Allowance, which provided, in part, that:

> Applicant respectfully submits that such reasons are not the exclusive bases for patentability of this claim. Additionally, the claim stands on its own merits and is patentable because of the overall ornamental design claimed, and not because of the presence or absence of any one particular design element or feature.

Dkt. 79-11 at 1. Each Asserted Patent is shown below:

---

[6] "A Notice of Allowability form PTOL-37 is used whenever an application has been placed in condition for allowance." Manual of Patent Examining Procedure ("MPEP") § 1302.03.

"While USPTO references like the MPEP are not legally binding, courts may consider them as instructive interpretations of patent law." *Sure Fit Home Prods., LLC v. Maytex Mills, Inc.*, No. 21-cv-02169 (LGS), 2021 WL 4790580, at *2 n.1 (S.D.N.Y. Oct. 14, 2021) (citing *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295 (Fed. Cir. 2017)). Both parties refer to the MPEP.



Following its grant of Plaintiff's design patents (*i.e.*, the Asserted Patents), the USPTO approved Plaintiff's Utility Patent Application on November 29, 2022. *See* Shunock Utility Patent at 1.

### H.    Plaintiff's 2023 Demand Letter

On June 26, 2023, having been granted the Asserted Patents nearly a year earlier, Plaintiff informed Apple that it was selling products featuring the Activity Rings that he believed infringed the Asserted Patents. Compl. ¶ 54; Answer ¶ 54; *see* Def. RSUF II at 138 ¶ 2. Apple replied on the same day, and the parties met and conferred several times between June and September 2023. Compl. ¶ 55; Answer ¶ 55. Apple denies infringement and continues to use its Activity Rings design in its products. Compl. ¶ 56; Answer ¶ 56.

## II.    Procedural History

Plaintiff commenced this action on September 29, 2023. *See* Compl. Apple answered and asserted fourteen counterclaims on November 16, 2023. *See* Answer; Countercls. On December 21, 2023, Plaintiff filed a motion to dismiss Defendant's counterclaims and to strike Defendant's fourth affirmative defense of unenforceability based on inequitable conduct, Dkt. 19, which the Court granted in part and denied in part on June 21, 2024, Dkt. 63 (denying motion to dismiss and granting motion to strike). The action thereafter proceeded through fact and expert discovery.

On May 31, 2024, the parties filed a joint claim-construction chart. Dkt. 39. Plaintiff filed his opening claim-construction brief on September 20, 2024, Dkt. 79; Defendant filed its response on October 18, 2024, Dkt. 80; and Plaintiff filed his reply on October 25, 2024, Dkt. 83. On December 12, 2024, the Court held a *Markman* hearing to determine how to construe the Asserted Patents. Dkt. 92 ("Markman Tr."). Following the hearing, the Court "elect[ed] to let the illustrations in the Asserted Patents serve as their own best description," Dkt. 94 ("Markman

15

Order") at 26 (internal quotation marks and citation omitted), and clarified only that "[t]he scope of [each] design claim does not include or relate to functionality," *id.* at 29-30.

On June 20, 2025, Plaintiff filed a motion for partial summary judgment on invalidity. Pl. Mot.; Pl. Br.; Pl. SUF. Defendant filed its opposition on July 11, 2025, Def. Opp.; Def. RSUF, and Plaintiff replied on July 25, 2025, Pl. Reply; Pl. RSUF II. Also on June 20, 2025, Defendant filed its motion for summary judgment on invalidity and non-infringement. Def. Mot.; Def. Br.; Def. SUF. Plaintiff likewise filed opposition on July 11, 2025, Pl. Opp.; Pl. RSUF, and Defendant replied on July 25, 2025, Def. Reply; Def. RSUF II. On September 9, 2025, Defendant sought leave to, among other things, submit supplemental briefing concerning a 2017 attorney-client privileged memorandum from Plaintiff's former counsel. Dkt. 257. The Court granted Defendant's request. Dkt. 276. Defendant thereafter filed its supplemental brief on October 31, 2025, Def. Supp. Br., and Plaintiff filed his response on November 7, 2025, Pl. Supp. Resp. Later, on November 20, 2025, Defendant filed a notice of supplemental authority in support of its summary judgment motion. Dkt. 283.

In addition to their summary judgment motions, the parties submitted dueling *Daubert* motions. Defendant moved to exclude Plaintiff's design expert, Jeffrey Pipe ("Pipe"), and Plaintiff's damages expert, Su Sun ("Dr. Sun"). *See* Pipe Daubert; Pipe Opp.; Pipe Reply; Sun Daubert; Sun Opp.; Sun Reply. Plaintiff, in turn, moved to exclude Defendant's damages expert, Sara D. Rinke ("Rinke"), and its design expert, Scott Klemmer ("Klemmer"). *See* Rinke Daubert; Rinke Opp.; Rinke Reply; Klemmer Daubert; Klemmer Opp.; Klemmer Reply.

Defendant also filed two letter motions to seal or otherwise redact various briefs and exhibits associated with the above motions. Dkts. 191, 261. All motions are now fully briefed. On February 25, 2026, the parties appeared before the Court for oral argument on their respective summary judgment and *Daubert* motions. *See* Dkt. 291 ("Oral Arg. Tr.").

16

**LEGAL STANDARD**

Under Rule 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law[,]' [and] [a] dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rosen v. UBS Fin. Servs. Inc.*, No. 22-cv-03880 (JLR), 2023 WL 6386919, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In other words, "[t]here is 'no genuine dispute as to any material fact' where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts . . . ; or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law." *SEC v. Cole*, No. 12-cv-08167 (RJS), 2015 WL 5737275, at *3 (S.D.N.Y. Sept. 19, 2015) (citation omitted) (first citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); and then citing *Liberty Lobby*, 477 U.S. at 248).

At summary judgment, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "On cross-motions for summary judgment, each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *Cole*, 2015 WL 5737275, at *3 (quoting *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-08140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug 5, 2013)). To defeat a motion for summary judgment, the nonmoving party must advance more than "a scintilla of evidence," *Liberty Lobby*,

17

477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec.*, 475 U.S. at 586.

"On substantive questions of patent law, this Court is bound by the precedents of the U.S. Court of Appeals for the Federal Circuit." *PowX Inc. v. Performance Sols., LLC*, No. 24-cv-01389 (MMG), 2024 WL 3010040, at *6 (S.D.N.Y. June 14, 2024), *appeal dismissed*, 2025 WL 401209 (Fed. Cir. Feb. 5, 2025); *see also Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988) ("[S]ubstantive matters unique to patent law [are] governed by the law of this court.").

## DISCUSSION

Defendant moves for summary judgement on the issues of non-infringement and invalidity. *See generally* Def. Br. Plaintiff, in turn, moves for partial summary judgment on invalidity alone. *See generally* Pl. Br. Each party further seeks to exclude the testimony of two of the other party's expert witnesses. *See generally* Pipe Daubert; Sun Daubert; Rinke Daubert; Klemmer Daubert.

For the reasons below, the Court finds that no reasonable jury could find that Defendant has infringed any of the Asserted Patents, because the Activity Rings are plainly dissimilar. The Court accordingly grants Defendant summary judgment on non-infringement. The remainder of Defendant's motion, Plaintiff's motion for partial summary judgment, and both parties' *Daubert* motions are therefore dismissed as moot.

## I. Non-Infringement

Defendant moves for summary judgment on non-infringement on three grounds. First, Defendant argues that Plaintiff has not identified a legally cognizable act of infringement at the point of sale because the accused products — iPhones and Apple Watches — are sold in packaging with the devices powered off and their screens blank. Def. Br. at 15-16. That is,

18

because the Asserted Patents claim a "display screen with graphical user interface," and because the accused products do not display any GUI at the time of sale, the accused designs do not meet the requisite requirement for infringement of being applied to the relevant article of manufacture. *Id.* Second, Defendant contends that Plaintiff cannot establish infringement as a matter of law because Plaintiff's expert, Pipe, misapplies the governing ordinary observer test. *Id.* at 16-20. Third, and relatedly, Defendant argues that under the proper legal standard, no reasonable jury could find that an ordinary observer would confuse the accused designs with the asserted patents given the significant visual differences between them. *Id.* at 20-24. At minimum, Defendant maintains that Plaintiff has failed to articulate a claim for willful infringement because Plaintiff lacks any evidence of pre- or post-suit willfulness. *Id.* at 26-27.

In response, Plaintiff first argues that Defendant's point-of-sale framing improperly restricts the infringement analysis and that the appropriate question is whether the accused designs are displayed at any point during ordinary use. Pl. Opp. at 8-12. Next, Plaintiff maintains that Pipe does not improperly apply the ordinary observer test. *Id.* at 13-14. Plaintiff further contends that Apple has failed to show that, under the ordinary observer test, no reasonable jury could find infringement, particularly in light of what Plaintiff argues is the appropriate comparison prior art. *Id.* at 14-34. Finally, Plaintiff points to pre-issuance conduct and post-issuance continued sales that he believes support his willfulness argument. *Id.* at 34-36.

The Court now addresses the various arguments presented.

A.    **No Reasonable Jury Could Find that Apple *Willfully* Infringed the Asserted Patents**

The Court will begin by addressing Defendant's motion for summary judgment on willfulness because it is easily dispensed with. With respect to Plaintiff's claim for treble damages based on willful infringement, "Section 284 [of the Patent Act] gives district courts

discretion in meting out enhanced damages." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 107 (2016); *accord SynQor, Inc. v. Vicor Corp.*, No. 2024-1879, 2026 WL 410931, at *9 (Fed. Cir. Feb. 13, 2026); *see also SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) ("Discretion remains with the district court to determine whether the conduct is sufficiently egregious to warrant enhanced damages."); Compl. at 39 (seeking, *inter alia*, "[a] judgment awarding . . . treble damages, based on any infringement found to be willful, pursuant to 35 U.S.C. § 284"). In *Halo*, the Supreme Court instructed that enhanced damages "should generally be reserved for egregious cases typified by willful misconduct." *Halo*, 579 U.S. at 106;[7] *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1383 (Fed. Cir. 2017) ("The *Halo* test merely requires the district court to consider the particular circumstances of the case to determine whether it is egregious."). Even then, "an award of enhanced damages does not necessarily flow from a willfulness finding." *SRI Int'l*, 14 F.4th at 1330 (quoting *Presidio*, 875 F.3d at 1382).

"To establish willfulness, a patentee must show that the accused infringer had a specific intent to infringe at the time of the challenged conduct." *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 28 F.4th 1247, 1274 (Fed. Cir. 2022); *accord Eko Brands, LLC v.*

---

[7] Before *Halo*, the governing test came from the Federal Circuit's decision in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The factors to be considered under *Read* include: (1) whether the defendant deliberately copied the ideas or design of another, (2) whether the defendant investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the defendant's behavior in the litigation, (4) the defendant's size and financial condition, (5) the closeness of the case, (6) the duration of defendant's misconduct, (7) the defendant's remedial action, (8) the defendant's motivation for harm, and (9) whether the defendant attempted to conceal its misconduct. *Id.* at 827. Both the *Read* and *Halo* tests are used today. *See, e.g.*, *SynQor*, 2026 WL 410931, at *9 (discussing application of both tests); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed. Cir. 2017) (same).

*Adrian Rivera Maynez Enters., Inc*., 946 F.3d 1367, 1378 (Fed. Cir. 2020).  "To willfully infringe a patent, the patent must exist and one must have knowledge of it."  *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985); *accord Olaf Sööt Design, LLC v. Daktronics, Inc.*, 325 F. Supp. 3d 456, 461 (S.D.N.Y. 2018); *see also Gustafson, Inc. v. Interstates Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) ("[A] party cannot be found to have 'willfully' infringed a patent of which the party had no knowledge.").  "Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness.  Rather, willfulness requires deliberate or intentional infringement."  *Bayer Healthcare LLC v. Baxalta Inc.,* 989 F.3d 964, 988 (Fed. Cir. 2021).  "[A] party seeking enhanced damages under § 284 bears the burden of proof by a preponderance of the evidence."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1339 (Fed. Cir. 2016).  "Summary judgment is appropriate on a willful infringement claim 'if Defendant[] can point to an absence of record evidence concerning its knowledge of the patent-in-suit and its claims.'"  *Kewazinga Corp. v. Microsoft Corp.*, 558 F. Supp. 3d 90, 119 (S.D.N.Y. 2021) (alterations adopted) (quoting *Olaf Sööt Design*, 325 F. Supp. 3d at 461); *see, e.g.*, *BASF*, 28 F.4th at 1252 ("Willfulness was not decided by the jury, the district court having ruled that the evidence would not support a finding of willfulness.").

Here, summary judgment on willfulness is appropriate because Shunock has failed to raise a genuine issue of material fact suggesting that any alleged infringement by Apple was willful.  Shunock does not dispute that "[t]he Apple designers who designed the Activity rings [testified that they] had no knowledge or awareness of Dr. Shunock, the Spread Media logo, the Spread app, or the Asserted Patents prior to the filing of the complaint on September 29, 2023."  Pl. RSUF ¶ 11.  Instead, Plaintiff argues that "[w]hile it is undisputed that Apple designers *testified* that they had no such knowledge or awareness, there is significant evidence of copying,"

21

*id.*, namely "[Apple's] connections to 1K designers and [Apple's] 'swipe' gathering process," Pl. Opp. at 35.[8]  Given the absence of record evidence supporting Plaintiff's allegations, however, his argument against summary judgment amounts to no more than speculation.

At bottom, Plaintiff is merely challenging the credibility of the consistent testimony from Apple designers denying any knowledge of Plaintiff's designs.  "Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact." *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261-62 (2d Cir. 2005) (collecting cases); *accord Desia v. GE Life & Annuity Assurance Co.*, 350 F. App'x 542, 544 (2d Cir. 2009) (summary order).  Without "affirmative evidence" that creates a basis to controvert the witnesses' credibility, Plaintiff has not carried his burden on summary judgment.  *See*, *e.g.*, *Crawford–El v. Britton*, 523 U.S. 574, 600 (1998) (finding "general attacks upon . . . credibility" are insufficient because plaintiff "must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden"); *Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) (same), *aff'd*, 367 F. App'x 178 (2d Cir. 2010) (summary order); *see also Island Software*, 413 F.3d at 262 ("Thus, though we view [the witnesses'] testimony in the light most favorable to [the non-movant], and must resolve any ambiguities in that testimony in [non-movant]'s favor, we will not, without affirmative evidence warranting an adverse inference, disregard [the witnesses'] uncontroverted assertions.") (citation omitted).  Plaintiff provides no such affirmative evidence.

---

[8] Plaintiff's willfulness theory was initially premised on an August 2013 meeting between Shunock and Apple App Store manager Donna Ogier, in which Shunock displayed the Spread Logo, prior to the Activity Rings' launch.  *See* Compl. ¶¶ 21-22.  When questioned at oral argument about his abandonment of this theory, Plaintiff acknowledged that discovery revealed that "the Apple [A]ctivity [R]ings design was created" "six months before" the meeting.  Oral Arg. Tr. at 93:7-21.

Plaintiff first offers the fact that "Plaintiff's design was created with help from Michael Gottschalk at 1K Studios, which also worked for Apple and displayed Plaintiff's work on the walls of its offices, which Apple employees visited." Pl. Opp. at 7. It is true that Gottschalk testified that it is "possible" that someone "walking through the lobby of 1K Studios after January 2013 would see materials designed for Spread Media, because they are displayed . . . on the wall within that lobby," Gottschalk Tr. at 68:8-13, and that "[t]here were visits from all sorts of clients, including clients from Apple Computer," at 1K Studios, *id.* at 68:25-69:3. However, Plaintiff does not argue, or present any evidence, that those visitors who "possibl[y]" saw materials designed for Shunock included Apple designers who designed the Activity Rings. Nor, for that matter, does Plaintiff identify *any* alleged visitor from Apple. "Such sheer speculation . . . does not create a genuine dispute as to material facts that precludes summary judgment." *Chillemi v. Town of Southampton*, No. 12-cv-03370 (JFB) (AKT), 2017 WL 6520722, at *18 (E.D.N.Y. Dec. 20, 2017).

Plaintiff next contends that the gathering of "swipe" by Apple designers Chance Graham ("Graham") and Joseph Chan ("Chan") reflects a "culture of copying" at Apple, and thereby serves as evidence of willful infringement of Plaintiff's designs. Pl. Opp. at 7-8, 35 (citation omitted). Beyond being unsupported by the record evidence, this theory is directly contradicted by it. "Swipe is an industry term that refers to collecting inspirational images." Def. RSUF ¶ 166; *see also id.* ¶ 165; Baldwin Decl., Ex. 49 ("Graham Tr.") at 170:1-20 ("Swipe . . . [is] an industry term that refers to . . . the collection of . . . inspirational images. It's . . . a common design practice for . . . designers and creative types to collect . . . things that inspire them[.]"). Plaintiff asserts, based on testimony from Apple designer Gary Butcher ("Butcher"), that Graham and Chan gathered swipe in connection with the Activity Rings design process, which Plaintiff claims supports a finding of willful infringement. Def. RSUF ¶ 166; Baldwin Decl.,

23

Ex. 12 ("Butcher Tr.") at 241:19-242:22 (testifying that while he "d[id]n't recall any specifics from the swipe," he "believe[d] the collection of swipe was a coeffort" between "Joseph" and "Chance").  Apple does not dispute that swipe was gathered during the Activity Rings design process, at least by Chan, Def. Reply at 12, but contends that the record reflects that this process cannot support a finding of willful infringement because "[t]he Activity ring design is not based on any 'swipe,'" Def. RSUF ¶ 166.

Even viewing the testimony of Butcher, Graham, and Chan in the light most favorable to Shunock, and resolving any ambiguities in that testimony in his favor — as the Court must do — the Court does not find any record evidence that raises a genuine dispute of material fact. Graham testified that he "didn't collect a lot of swipe [in] general" and "d[id]n't recall if [he] did in this case."  Graham Tr. at 175:11-15.  He went on, however, to unequivocally attest that neither the Spread Logo nor the Spread App was included within swipe for the Apple Watch because he "ha[d] no recollection of ever seeing that logo" and "can't imagine" such an "[un]compelling piece of design" "ever being included in any kind of swipe folder."  *Id.* at 295:24-296:12; *see also* 286:22-287:3 (Q: Looking at the Spread logo, Exhibit 44, was that included within swipe for Apple watch?  A: No.  Q: Was the Spread app included within swipe for Apple watch? . . . A: No.").  Chan, on the other hand, did recall personally gathering swipe for the Activity Rings design process, Baldwin Decl., Ex. 54 ("Chan Tr.") at 70:19-22, 75:8-76:15, 78:22-79:5.  But like Graham, he, too, testified unequivocally that "the [Spread Logo] was not collected in [his] swipe" because he had "never seen [the Spread Logo] before in [his] life." *Id.* at 117:18-19, 118:8-16.  Indeed, "Apple produced th[e] images [Chan collected as swipe], which undisputedly do not include the Spread logo (or anything similar)."  Def. Reply at 12; *see also generally* Selwyn Reply Decl., Ex. 61 (production of swipe, which does not contain the Spread Logo or related designs).  Given the lack of evidence in the record of pre-suit copying, let

24

alone knowledge of the Spread Logo or Spread App, Plaintiff has not presented anything more than speculation to support his opposition to summary judgment on willfulness. *See Contemp. Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) (finding that plaintiff must present "[s]omething more than a fanciful allegation . . . [in order] to justify denying" summary judgment). He has therefore failed to meet his burden.

Third, and finally, Plaintiff argues that Apple's ongoing post-suit manufacture and sale of products bearing the Activity Rings after receiving notice of the Asserted Patents through Plaintiff's June 26, 2023 demand letter "alone is sufficient to preclude summary judgment on willful infringement." Pl. Opp. at 36. The Court disagrees. Apple does not dispute receiving, and replying to, the June 26, 2023 demand letter. Answer ¶¶ 54-56. Thereafter, "[k]nowledgeable of the [Asserted] Patent[s] and of [Shunock]'s grounds for alleging infringement, [Apple] was forced to choose between [1] resting on theories of invalidity and non infringement it believed to be objectively reasonable and [2] engaging in costly and potentially unnecessary redesign of its accused products." *Inv. Tech. Grp., Inc. v. Liquidnet Holdings, Inc.*, 759 F. Supp. 2d 387, 411 (S.D.N.Y. 2010) (alterations adopted) (internal quotation marks and citation omitted), *aff'd sub nom.*, *Liquidnet Holdings, Inc. v. Pulse Trading, Inc.*, 478 F. App'x 671 (Fed. Cir. 2012) (per curiam). Apple chose the former option, informing Plaintiff both before and consistently throughout this litigation that it does not believe that the Activity Rings infringe the Asserted Patents. *See* Compl. ¶¶ 55-56; Answer ¶¶ 55-56; Def. Br. at 15-24.[9] "[A] party may continue to manufacture and may present what in good faith it believes to be a

---

[9] In *Kohler*, the Federal Circuit observed that, post-*Halo*, "[p]roof of an objectively reasonable *litigation-inspired* defense to infringement is no longer a defense to willful infringement." 829 F.3d at 1341 (emphasis added). Here, however, Apple has consistently argued that the Activity Rings do not infringe the Asserted Patents, including before Plaintiff commenced this litigation.

legitimate defense without risk of being found on that basis alone a willful infringer." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001) (quoting *Gustafson*, 897 F.2d at 511).[10]  As explained below, Apple's non-infringement defense is not only reasonable but correct.  *See infra* Section I.B.  Accordingly, Apple's motion for summary judgment that there was no willful infringement is granted.

### B.    No Reasonable Jury Could Find That Apple Infringed the Asserted Patents

#### 1.    *The Activity Rings Are Displayed During Ordinary Use*

With respect to infringement, Apple first argues that Shunock cannot show a legally cognizable act of infringement at the point of sale because the accused iPhones and Apple Watches are sold powered off, with blank screens and no displayed GUI.  Def. Br. at 15-16. Plaintiff responds that this point-of-sale framing improperly narrows the analysis and that the relevant question is whether the accused designs are displayed during ordinary use.  Pl. Opp. at 8-12.  He is correct.

Section 271 of the Patent Act provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent.  35 U.S.C. § 271(a); *see also MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005) ("It is well-established that the reach of section 271(a) is limited to infringing

---

[10] Plaintiff suggests that Apple's failure to identify "evidence that it received an opinion of counsel" precludes summary judgment on willfulness.  Pl. Opp. at 36 (citing *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1354 (Fed. Cir. 2018)).  But unlike defendants in *Polara*, Apple has not asserted an advice-of-counsel defense.  *See Polara*, 894 F.3d at 1354 ("[The defendant] asserts that its reliance on competent opinion of counsel demonstrates its good faith belief that the '476 patent was invalid or not infringed.").  And "[Apple]'s decision not to seek an advice-of-counsel defense is legally irrelevant under 35 U.S.C. § 298." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019); *see also* 35 U.S.C. § 298 ("[T]he failure of the infringer to present . . . advice [of counsel] to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent[.]").

activities that occur within the United States."). "Design patent infringement occurs when a party, 'without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied.'" *ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A"*, 52 F.4th 934, 941 (Fed. Cir. 2022) (quoting 35 U.S.C. § 289.[11]); *accord Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*, 836 F. App'x 895, 897 (Fed. Cir. 2020). "To show infringement under the proper test, [a plaintiff must establish that] an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010); *accord Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 933 (Fed. Cir. 2014); *Kohler Co. v. Signature Plumbing Specialties LLC*, No. 23-cv-09686 (AS), 2024 WL 4880069, at *2 (S.D.N.Y. Nov. 25, 2024). The Federal Circuit has consistently rejected the point-of-sale framing that Apple endorses, holding that "the 'ordinary observer' analysis is not limited to those features visible at the point of sale, but instead must encompass all ornamental features visible *at any time during the normal use of the product*," with the factfinder assessing "if the resemblance *at such point* is such as to deceive." *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1381 (Fed. Cir. 2002) (alteration adopted and emphasis added), *abrogated in part on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008); *see, e.g., Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1241 (Fed. Cir. 2009); *Anderson*, 570 F. App'x at 933; *High Point Design LLC v. Buyer's Direct, Inc.*, 621 F. App'x 632, 640 (Fed. Cir. 2015); *see also, e.g.,*

---

[11] Section 289 of the Patent Act provides an "[a]dditional remedy for infringement of design patent." 35 U.S.C. § 289.

*Wine Enthusiast, Inc. v. Vinotemp Int'l Corp.*, 317 F. Supp. 3d 795, 801 (S.D.N.Y. 2018). [12]

"'[N]ormal use' in the design patent context extends from the completion of manufacture or

assembly until the ultimate destruction, loss, or disappearance of the article." *Int'l Seaway*, 589

F.3d at 1241 (quoting *Contessa*, 282 F.3d at 1379).  It is undisputed that normal use of the

iPhone and Apple Watch can include configuring each device to display the Activity Rings.  *See*

Pl. RSUF ¶¶ 22, 24, 27.  Thus, because there is a potential act of infringement, the Court

proceeds to the infringement analysis.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983,

989, 997 (Fed. Cir. 2015), *rev'd and remanded on other grounds*, 580 U.S. 53 (2016) (bringing

direct infringement claim for GUI design patent for phone screen display).

### 2.  *No Reasonable Jury Could Find That the Asserted Patents and the Activity Rings Are Substantially Similar*

In support of its motion for summary judgment on non-infringement, Apple argues that

"no ordinary observer familiar with the prior art would view the Accused Designs as

substantially similar to the Asserted Patents such that they would be deceived into purchasing the

former supposing them to be the latter." Def. Br. at 20.  According to Apple, notable differences

between the Asserted Patents and the Activity Rings include, among others: (1) "the vertical

alignment" of the rings "at 12 o'clock" compared to the staggered alignment of the Asserted

Patents' arcs; (2) "the [greater] thickness and [reduced] spacing" of the rings relative to that of

---

[12] In its briefing, Apple cited no cases in support of its point-of-sale analysis.  *See generally* Def. Br.; Def. Reply.  At oral argument, it offered a single out-of-Circuit district court case, *Wepay Glob. Payments LLC v. PNC Bank N.A.*, 22-CV-00592-MJH, 2022 WL 1782504 (W.D. Pa. June 1, 2022).  In *Wepay*, the court observed that "the ordinary observer test would seem not to fit squarely with the designs at issue" because "the consumer has not voluntarily chosen the design at issue" and "[i]nstead, the Accused Design is incidental to the PNC customers['] utilization of the mobile application" integrating the design.  *Id.* at *3.  This brief analysis does not address the Federal Circuit's rejection of the point-of-sale approach to infringement, as set forth in *Contessa* and its progeny.  In any event, despite its observation, the *Wepay* court nevertheless conducted an infringement analysis.  *Id.*

the Asserted Patents' arcs; (3) the rings' central "positioning on the screen" versus the left alignment of the Asserted Patents' arcs; (4) the presence of fixed "circular ring tracks" solely in the Activity Rings design; and (5) the presence of "arrow symbols" solely in the Activity Rings design. *Id.* at 23. Plaintiff does not dispute that those differences exist. Pl. RSUF ¶¶ 122-25, 127. Instead, relying on Pipe's expert reports, Plaintiff responds that any difference between the Asserted Patents and the Activity Rings is "minor," and the "designs' overall visual impression[s]" are not plainly dissimilar. Pl. Opp. at 23; *id.* 24-30. Indeed, Plaintiff further argues that, when the relevant prior art is considered, the similarities between the Asserted Patents and the Activity Rings become clearer. *Id.* at 30-34. The Court disagrees. As outlined below, the overall visual impact of the Asserted Patents and the Activity Rings, even absent consideration of the prior art, is plainly dissimilar such that no reasonable jury could find infringement.

"Design patent infringement is a question of fact, which a patentee must prove by a preponderance of the evidence." *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1129 (Fed. Cir. 2019). "Summary judgment of non-infringement is appropriate when no reasonable fact-finder could find the accused design substantially similar to the claimed design." *High Point*, 621 F. App'x at 640-41 (citing *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1578 (Fed.Cir.1995)). Disagreement among the parties or their experts about whether a reasonable jury could conclude that the designs are substantially similar does not necessarily preclude entry of summary judgment. *See, e.g.*, *Harel v. K.K. Int'l Trading Corp.*, 994 F. Supp. 2d 276, 284 (E.D.N.Y. 2014) ("[E]xpert testimony . . . cannot create a material issue of fact, where [a] visual comparison reveals that the alleged infringing [design] is not substantially similar to the [patented] design."); *Egyptian Goddess*, 543 F.3d at 681-82

(affirming summary judgment of non-infringement despite expert testimony regarding similarity).

Courts examine design patent infringement under the ordinary observer test, which provides that a design infringes a patent "[i]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, [the] two designs are substantially the same." *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1871)). To be "substantially the same," "the resemblance [between the accused and asserted design must be] such as to deceive an [ordinary] observer, inducing him to purchase one supposing it to be the other." *Id.* (internal quotation marks omitted) (quoting *Gorham*, 81 U.S. at 528). "[T]he deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation." *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006); *accord Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015). "The ordinary observer test applies to the patented design in its entirety, as it is claimed." *Crocs, Inc.*, 598 F.3d at 1303.[13] "[M]inor differences between a patented design and an accused article's design cannot . . . prevent a finding of infringement." *Int'l Seaway*, 589 F.3d at 1243 (quoting *Litton Sys., Inc. v. Whirlpool*, 728 F.2d 1423, 1444 (Fed. Cir. 1984)).

---

[13] However, "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (quoting *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)). In conducting the ordinary observer test, courts consider only the ornamental features of the design, including any ornamental aspects of functional features, but not the design's functional aspects. *See Ethicon*, 796 F.3d at 1336 ("[B]ecause each of these components has a functional aspect, the underlying elements must be excluded from the scope of the design claims at this general conceptual level."); *OddzOn Prods.*, 122 F.3d at 1405 ("If . . . a design contains both functional and ornamental features, the patentee must show that the perceived similarity is based on the ornamental features of the design."). This additional step in the infringement analysis is inapplicable where, as here, the Court has already clarified that "[t]he scope of the design claim [for each Asserted Patent] does not include or relate to functionality." Markman Order at 29-30.

30

"The ordinary observer is considered to be familiar with prior art designs." *Columbia Sportswear*, 942 F.3d at 1129. In line with that assumption, courts applying the ordinary observer test proceed in two stages. First, "[w]here the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,' the patentee fails to meet its burden of proving infringement as a matter of law." *Ethicon*, 796 F.3d at 1335 (quoting *Egyptian Goddess*, 543 F.3d at 678); *see also Egyptian Goddess*, 543 F.3d at 678 ("In some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear 'substantially the same' to the ordinary observer[.]"). Second, "[i]f the claimed and accused designs are not plainly dissimilar, the inquiry may benefit from comparing the claimed and accused designs with prior art to identify differences that are not noticeable in the abstract but would be significant to the hypothetical ordinary observer familiar with the prior art." *Ethicon*, 796 F.3d at 1335; *accord Egyptian Goddess*, 543 F.3d at 678; *see also ABC Corp.*, 52 F.4th at 942 ("Where a patented design and an accused product are not 'plainly dissimilar,' the court must conduct a threeway analysis comparing the accused product, the patented design, and the prior art." (quoting *Egyptian Goddess*, 543 F.3d at 677-78)).

Before commencing this analysis, the Court addresses two threshold issues. First, while the parties agree that the ordinary observer test is to be applied, they disagree as to the manner of its application in the GUI context. Second, before examining whether an ordinary observer would confuse the Activity Rings with the Asserted Patents, it is necessary to reiterate the scope of the Asserted Patents to inform the comparison between the designs. The Court will discuss each issue in turn.

Plaintiff proffers, and Apple appears to concede, that an ordinary observer in this case is one "who has shopped for or purchased display screens with GUIs." Pl. Opp. at 21; *see also*

*generally* Def. Br.; Def. Reply.  In applying the ordinary observer test, however, Plaintiff takes this definition one step further, arguing that because "GUIs are viewed quickly, functionally, and at a glance," the ordinary observer would "view[] GUI designs [like the Asserted Patents] at a glance."  Pl. Opp. at 22.  That is to say that an ordinary observer would merely glance at the Asserted Patents and the Activity Rings when comparing the two.

Plaintiff's framing misconstrues the ordinary observer test and the nature of GUIs.  As to the ordinary observer test, the focus is not on the ordinary *user*, who may glance at various GUIs in the normal course; rather, the inquiry is whether the ordinary observer, "giving such attention as a *purchaser* usually gives," would confuse the designs.  *See Egyptian Goddess*, 543 F.3d at 670 (emphasis added) (quoting *Gorham*, 81 U.S. at 528).  The ordinary observer test dictates that such purchaser be an "observer[] of ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which [a person] of ordinary intelligence give[s].'"  *Contessa*, 282 F.3d at 1381-82 (quoting *Gorham*, 81 U.S. at 528).  To be sure, as Plaintiff stresses, the ordinary observer is "not a patent lawyer 'who inspects the designs critically to highlight each and every perceivable difference between them.'"  *Hutzler Mfg. Co. v. Bradshaw Int'l, Inc.*, No. 11-cv-07211 (PGG), 2012 WL 3031150, at \*6 (S.D.N.Y. 2012) (quoting *Durdin v. Kuryakyn Holdings, Inc.*, 440 F. Supp. 2d 921, 933-34 (W.D. Wis. 2006)).  However, "observers of ordinary acuteness, bringing to the examination . . . that degree of observation which [people] of ordinary intelligence give," *Contessa*, 282 F.3d at 1381-82 (quoting *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1117 (Fed. Cir. 1998), *abrogated in part on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)), would not simply 'glance' at display screens with GUIs in the purchasing context.  "A GUI allows a computer user to send commands to his or her computer by manipulating graphical images on the computer screen, most commonly with a mouse."

32

*Comput. Access Tech. Corp. v. Catalyst Enters., Inc.*, No. C-00-4852-DLJ, 2001 WL 34118030, at *1 n.1 (N.D. Cal. June 13, 2001).  Notable, and apropos, examples include "Microsoft's GUI, called Windows" and "Apple Computer, Inc.['s] . . . Macintosh."  *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1298 (D. Utah 1999).  One would be hard-pressed to argue that either of those GUIs "are viewed . . . at a glance" during ordinary use, Pl. Opp. at 22, even if certain GUI elements could be viewed more cursorily.  *See WePay Glob.*, 2022 WL 17279115, at *1 ("[GUI] [e]lements include a window that displays information on the screen, a menu that contains a list of selections that allows the user to make choices, and small picture icons.").  Thus, neither the nature of GUIs nor the contours of the ordinary observer test compel a finding that a comparison of the Asserted Patents and the Activity Rings must be done "at a glance."

Moving on to the Asserted Patents' scope, the Court's Markman Order clearly set out the extent of Plaintiff's patent rights: seven static two- and three-arc designs covering specific configurations, "as shown in the Figure[s]."  Markman Order at 29-30; *see* Markman Tr. at 7:17-8:7 (representation by Plaintiff that "[a]ll [Plaintiff is] claiming is what's in th[e] solid line[s] [of the Asserted Patents]," and "not[hing] extending any further than what's depicted in [the] picture[s]"); Oral Arg. Tr. at 66:8-19 (confirming that Plaintiff's Asserted Patents are not claiming dynamic arcs).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Holmberg v. U.S.*, 124 Fed. Cl. 610, 614 (2016) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)).  For that reason, "[i]n determining patent infringement," courts "first examine[] the scope and meaning of the asserted patent claims" to "define the scope of the invention."  *See Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003) (citation omitted)); *see also Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1285 (Fed. Cir. 2007) ("[P]atent claim scope defines the scope of patent protection."); *accord Johnson & Johnston*

33

*Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002).  Despite this cardinal patent law principle — and despite Plaintiff's assurances that "[n]either Pipe nor Plaintiff have ever purported to enlarge the scope [of] Plaintiff's claims beyond the *Markman* order," Pl. Opp. at 14 — Plaintiff now asserts that "there are innumerable . . . infringing states [of the Activity Rings] within the (non-infringing) edge cases of fully empty and fully closed rings," *id.* at 17.[14] The allegedly infringing figures below are only representative samples under Plaintiff's infringement theory, while the disclaimed configurations encompass the full set of figures Plaintiff has admitted do not infringe:

**Fig. 1: Activity Rings configurations that Pipe claims infringe:[15]**



**Fig. 2: Activity Rings configurations that Pipe claims <u>do not</u> infringe:[16]**



---

[14] Plaintiff's infringement theory has shifted over the course of this litigation.  His initial infringement contentions, served on April 1, 2024, identified six images of allegedly infringing Activity Rings configurations.  JSUF ¶ 13.  Later, in a February 24, 2025 response to Apple's Requests for Admission, Plaintiff identified fifteen allegedly infringing configurations.  Pl. RSUF ¶ 32.  One day after that, he identified nine allegedly infringing configurations in his Supplemental Infringement Contentions and "contended that there are potentially infinite permutations of the [Activity Rings] whose overall visual impact is substantially similar to any or all of the Asserted Patents and therefore, infringing."  JSUF ¶ 14 (alterations adopted) (citation omitted).  Thereafter, on May 2, 2025, Pipe's Rebuttal Report appeared to disclaim specific configurations as infringing, *see* Pl. RSUF ¶¶ 34-42, 45-47; *see also* Pipe Rebuttal Report at 141-43, Table 1, and Plaintiff adopted Pipe's approach in his subsequent Amended Responses and Objections to Apple Inc.'s Fourth Set of Requests for Admission, Pl. RSUF ¶ 44, which Plaintiff served on May 7, 2025, *id.* ¶ 43.  Despite those specific disclaimers, however, Plaintiff still maintains that there are innumerable infringing states of the Activity Rings.  Pl. Opp. at 17.

[15] JSUF ¶ 16.

[16] *Id.*

In support of its expansive infringement theory, Plaintiff's expert, Pipe, opines that "an ordinary observer would perceive the fixed, static designs in the Asserted Patents" as being "dynamically flexible," and asserts that this perceived variance in the Asserted Patents broadens the scope of Activity Rings configurations that could appear substantially similar.  Def. Br. at 18 (citation omitted); *see also* JSUF ¶¶ 45-48.  But this infringement theory is contrary to the law. While an ordinary observer could perceive an accused design more expansively, rendering it within the scope of a given patent, the ordinary observer's perception of a patent cannot expand the scope of the patent itself.  It is undisputed that the Asserted Patents cover only the static arcs limited to the arrangements "as shown in [each] Figure."  Markman Order at 29-30; *see also* Markman Tr. at 7:17-8:7 (confirming that Plaintiff solely has claim to arc configurations as shown in Asserted Patents, with no variance therefrom); Oral Arg. Tr. at 66:8-19 (same).  Thus, even if, as Pipe claims, an ordinary observer were to perceive the Asserted Patents as being "dynamically flexible," JSUF ¶ 53, the Asserted Patents' scope would nevertheless cabin Plaintiff's infringement claim to the static arcs as shown in the Figures, *see Smartrend Mfg. Grp., Inc. v. Opti-Luxx Inc.*, 159 F.4th 1322, 1329 (Fed. Cir. 2025) ("Where a design is claimed 'as shown and described' . . . the patent's scope of protection is limited by the drawings and accompanying description in the patent.").  Put another way, "the [patents'] claims mark the outer boundaries of the patent right to exclude."  *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co.*, 384 F.3d 1333, 1336 (Fed. Cir. 2004).  Thus, Plaintiff has no infringement claim for the Activity Rings configurations in **Figure 1** above, which heavily deviate from the arc arrangements as shown in the Asserted Patents' Figures, because they are plainly dissimilar and outside of the proper scope of the Asserted Patents.

As for the accused Activity Rings configurations that align most closely with those of the Asserted Patents, a side-by-side comparison as shown below illustrates that they are plainly dissimilar to the Asserted Patents:

| '802 Patent | Accused Activity Rings Configuration |
|---|---|
| | |
| '804 Patent | Accused Activity Rings Configuration |
| | |
| '805 Patent | Accused Activity Rings Configuration |
| | |



| '806 Patent | Accused Activity Rings Configuration |
| --- | --- |
| '803 Patent | Accused Activity Rings Configuration |
| '807 Patent | Accused Activity Rings Configuration |
| '808 Patent | Accused Activity Rings Configuration |

With respect to the two-arc Asserted Patents ('802, '804, '805, '806), no reasonable juror

could find that an ordinary observer would perceive any configuration of the Activity Rings — a

37

three-ring design — as substantially similar to the Asserted Patents.  Pipe opines that when the third ring is not extended beyond its roughly circular initial shape, "the two large arcs overwhelmingly command the viewer's focus, while the small circular element . . . recedes into the background," Pipe Rebuttal Report ¶ 163, meaning that, despite their three-ring design, the Activity Rings may, at certain configurations, be *perceived* as a two-ring design by an ordinary observer.  Given the fixed three-ring track that appears underneath the rings in the Activity Rings design, the Court does not agree that "the overall visual effect" on the ordinary observer would be that of a two-arc design.  *High Point*, 621 F. App'x at 641.  But even if the ordinary observer would perceive the Activity Rings in the manner that Pipe describes, there are several differences that readily prevent the ordinary observer from finding *any* of the Asserted Patents to be substantially similar to their corresponding accused Activity Rings configuration.

Whether it be Plaintiff's two-arc design or his three-arc designs, "the nonfunctional, ornamental aspects" of each Asserted Patent and Activity Rings configuration, viewed as a whole, are "plainly dissimilar." *Ethicon*, 796 F.3d at 1337 (citing *Egyptian Goddess*, 543 F.3d at 678).[17]  Thus, the Court need not refer to the prior art.  *Id.*  In comparing each Asserted Patent with its corresponding Activity Rings configuration, the Court recognizes that each is essentially

---

[17] The "plainly dissimilar" language in *Egyptian Goddess* was recently the subject of a dissenting opinion in *Range of Motion Prods., LLC v. Armaid Co.*, 166 F.4th 981 (Fed. Cir. 2026).  There, Chief Judge Moore proposed that the Federal Circuit's "linguistic sleight of hand (substantially similar to plainly dissimilar) [in *Egyptian Goddess*] resulted in a significant change in the law." *Id.* at 995 (Moore, C.J., dissenting).  Specifically, Chief Judge Moore contends that "focusing on differences makes those differences more significant and causes [one] to lose sight of the overall similarity." *Id.*  In recognition of that criticism, the Court clarifies that, while its infringement analysis examines several differences between the Asserted Patents and the Activity Rings, those differences only became clear as the Court evaluated the overall similarity between the designs. That is to say, the differences between these designs did not become apparent because the Court *sought out* differences — they were evident *despite* the Court's efforts to find commonalities in the designs' overall visual impact.

38

a concentric arc design with curved ends.  That alone is not enough.  "Such high-level similarities . . . are not sufficient to demonstrate infringement." *High Point*, 621 F. App'x at 641.  Indeed, the Court need look no further than the opinion of Plaintiff's expert, Pipe, to discern the key differences that render the designs' overall visual impacts dissimilar.[18]  In differentiating the Asserted Patents from the prior art, Pipe opines: "While, at first glance, the designs may share certain visual similarities, they fundamentally differ in their overall visual complexity and perceptual impact due to the spacing between the arcs, arc length flexibility, and arc alignment."  Pipe Report ¶ 381.  According to Pipe — and, by extension, Plaintiff — differences in spacing and alignment alter the ordinary observer's perception of a design as a whole.  The Court agrees and finds these same differences evident when comparing the Asserted Patents to their corresponding accused Activity Rings configuration.

First, and primarily, the Activity Rings dramatically differ from the Asserted Patents with respect to the alignment of the arcs.  The Activity Rings designs are vertically aligned at around 12 o'clock, while the Asserted Patents are staggered with no perceptible shared anchoring point.  The Activity Rings accordingly have the visual effect of a stopwatch tracking the passage of time; the rings evoke progress along a defined path from a shared starting point.  The three-ring track underneath the rings reinforces this impression.  In contrast, the Asserted Patents create a visual impression of a ray expanding or radiating outward, particularly given that the snail-like tracks underneath the arcs form no part of Shunock's claims (and therefore provide no anchoring point or perceived path for the arcs).  *Cf.* Shunock Utility Patent at 26 (recognizing that FIG. 13 is "particularly effective in providing an illustration of how passionate each category is about an

---

[18] The Court's use of language from and references to Pipe's reports should not be construed as an endorsement of the Gestalt principles central to his assessment of the Asserted Patents and Activity Rings; nor should it be construed as a rebuff of the approach.

item or image in such a way as to 'radiate' from the core of the illustration where the passion is highest"). Indeed, Pipe recognized a similar distinction when distinguishing the Asserted Patents from the prior art. *See* Pipe Report ¶ 384 ("[T]he alignment of the arcs between the[] two designs is dramatically different.").

Second, the spacing between the arcs in the Activity Rings is noticeably different from the spacing between the Asserted Patents' arcs, meaningfully altering how an ordinary observer would perceive the overall design. The almost imperceptible spacing between the Activity Rings conveys a sense of cohesion and association among the rings, while the contrast in color and arrow symbols unique to each arc subtly distinguish them. This further contributes to the overall impression of shared, but not necessarily simultaneous, progress toward completion. The design makes it apparent that each ring moves in a single clockwise direction until its loop is complete. By contrast, the wider spacing between the arcs in the Asserted Patents makes them appear as separate elements diverging or radiating away from each other, rather than progressing together toward an established, common end point. Here, again, Pipe, in contrasting the Asserted Patents with the prior art, acknowledged that arc spacing is a difference that matters. Pipe Report ¶ 382 (opining that "the arc spacing between the[] two designs is completely different, resulting in meaningful differences in the perception of the viewer," as "elements that are close together appear to be more related than elements that are spaced farther apart").

Third, the difference in arc thickness between the Asserted Patents and the Activity Rings creates variance in the two designs' overall visual impact. The thicker arcs in the Activity Rings promote a more cohesive overall visual impression in contrast to the thinner arcs in the Asserted Patents with their wider spacing. Pipe yet again acknowledged, in distinguishing the prior art, that arc thickness can impact the look and feel of a design on the whole. Pipe Report ¶ 385 (noting that "design elements . . . such as thickness . . . balance visual appeal with readability").

40

Finally, the arcs in the Activity Rings are roughly centered, whereas the arcs in the Asserted Patents are shifted to the left. That difference reinforces distinct overall impressions: the Activity Rings evoke a cohesive, shared path toward loop closure, while the Asserted Patents' arcs appear to radiate or expand incrementally leftward. Although the disclaimed "portions of the [GUI] form no part of the claimed design," as conveyed by the even-length broken lines, Markman Order at 29-30, those even-length broken lines "are environmental lines that illustrate underlying unclaimed GUI elements," *id.* at 12. The MPEP clarifies that such "broken lines may be used to show visible environmental structure, but may not be used to show hidden planes and surfaces." MPEP § 1503.02. It follows, then, that although broken lines are not claimed, they can still affect the overall visual impression of a design patent by showing its context or environment. As applied to the Asserted Patents, then, those environmental lines shift the arcs further to the left of the display screen boundary. This further confirms that the Activity Rings convey unified clockwise progression toward completion, whereas the Asserted Patents depict separated arcs extended leftward rather than progressing together as rings.

When each Asserted Patent and corresponding Activity Rings configuration is viewed as a whole, these differences contribute to overall visual impressions that are not sufficiently similar to one another. Thus, "the accused design[s] [are] sufficiently distinct that it [is] clear without more that [Shunock] has not met [his] burden of proving" that each Asserted Patent and its corresponding Activity Rings configuration "would appear 'substantially the same' to the ordinary observer." *Egyptian Goddess*, 543 F.3d at 678. Given this conclusion, it is also all the more apparent that Plaintiff cannot, as a matter of law, claim infringement of designs, such as those in Fig. 1 above, that are plainly dissimilar and clearly fall outside of the Asserted Patents' scope.

Other courts have made similar assessments in other contexts. For example, in *High Point*, summary judgment on non-infringement was granted for the accused where slipper designs were "plainly dissimilar" because the accused design "evoke[d] a soft, gentle image, while the [asserted] patent appear[ed] robust and durable." 621 F. App'x at 641.



Similarly, in *Raffel Systems, LLC v. Man Wah Holdings Ltd.*, the court granted summary judgment of non-infringement where cupholder designs were "'sufficiently distinct' and 'plainly dissimilar'" because of "the dimpled versus smooth appearance of the flange." 570 F. Supp. 3d 613, 641-43 (E.D. Wis. 2021).



Further, in *Think Green Ltd. v. Medela AG*, the court compared a design patent for a manual breast pump with an accused breast pump design.  It noted that "[e]ven if [defendant]'s product were exactly the same as [plaintiff]'s design in all other aspects, the Court finds that an ordinary observer would not find the translucent object to be substantially the same as the opaque object." No. 21 C 5445, 2022 WL 6123348, at *5 (N.D. Ill. Oct. 7, 2022).



Fig. 9

D'006 figure 9                    Medela Silicone Breast Milk Collector

Finally, in *Ethicon*, the court observed that there were several shared features, "[o]n a general conceptual level," between designs for two ultrasonic surgical devices, but that summary judgment of non-infringement was nonetheless appropriate because the designs were "plainly dissimilar."  796 F.3d at 1336-37.



D'804 patent, Fig. 1          Covidien's accused product

43

Although not required, a comparison to the prior art reinforces the lack of substantial similarity between the Asserted Patents and the Activity Rings. "[T]he scope of the prior art is not the universe of abstract design and artistic creativity, but designs of the same article of manufacture or of articles sufficiently similar that a person of ordinary skill would look to such articles for their designs." *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280, 1297 (Fed. Cir. 2024) (quoting *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1462 (Fed. Cir. 1997)); *see also Columbia Sportswear N.A., Inc. v. Seirus Innovative Accessories, Inc.*, 80 F.4th 1363, 1378 (Fed. Cir. 2023) ("[T]o qualify as comparison prior art, the prior-art design must be applied to the article of manufacture identified in the claim."). "[A]nalogous art for a design patent includes art from the same field of endeavor as the article of manufacture of the claimed design." *LKQ Corp.*, 102 F.4th at 1297. Here, Shunock's Asserted Patents are for "ornamental design[s] for a display screen with graphical user interface." '802 Patent at 1; '803 Patent at 1; '804 Patent at 1; '805 Patent at 1; '806 Patent at 1; '807 Patent at 1; '808 Patent at 1. The relevant field of endeavor is therefore graphic design. Baldwin Daubert Decl. II, Ex. 4 ("Klemmer Report") ¶ 137; *see* Markman Order at 21 (identifying the term "graphical user interface" as belonging to the "field of graphic design"); *see also* Sarah Burstein, *Uncreative Designs*, 73 Duke L.J. 1437, 1443 n.25 (2024) ("The phrases 'graphical user interface' and 'GUI' have fallen out of favor in the design world; it is more common to hear designers today speak about 'user interface' ('UI') design or 'user experience' ('UX') design. But design patents focus on the visual [rather than the functional]."). With that in mind, the comparison prior art would include designs for both GUIs and icons on display screens that predate the Asserted Patents' July 5, 2012 priority date. Indeed, the USPTO readily acknowledges the overlap between icons and GUIs. For example, the MPEP refers to both under the umbrella of "computer-generated electronic images." MPEP § 1504.01(a). Both "must be embodied in a display panel, or portion thereof, to satisfy 35 U.S.C.

44

171." *Id.* Both are "an integral and active component in the operation of — *i.e.*, embodied in and/or applied to — a programmed computer displaying the computer icon or the GUI." *Id.* And both are "not functional" despite being embodied in an "underlying article" that "has functional properties." *Id.* In sum, both computer icons and GUIs are in the field of graphic design, with icons being narrower in scope but nevertheless dealing with computer-generated electronic images as GUIs do. *See, e.g.*, *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001-02 (Fed. Cir. 2016) (affirming finding of analogous art where the patent-in-dispute and prior art were both "in the field of interface design, with [the prior art] focusing on graphical user interfaces and the [patent-in-dispute] focusing on interfaces for location-based services," because "[t]hese two areas of focus overlap within the broader field of interface design because the teachings in graphical user interface design . . . have relevance in interfaces for location-based applications"). The prior art is, accordingly, not limited solely to GUIs on display screens as Plaintiff proposes. Pl. Opp. at 31; *see Unwired Planet*, 841 F.3d at 1001 ("The field of endeavor of a patent is not limited to the . . . narrowest possible conception of the field.").

A comparison to relevant prior art reveals that the limited, shared characteristics between the Activity Rings and the Asserted Patents are also common to the prior art. *See, e.g.*, *Range*, 166 F.4th at 992 (affirming decision based on three-way comparison of claimed design, accused design, and prior art). Consider U.S. Patent D688,700 ("Brown"), an "ornamental design for a display screen with icon." APL-SHUNOCK_00006690. "Brown was filed on June 4, 2012," JUSF ¶ 89, before the Asserted Patents' alleged July 5, 2012 priority date. It is therefore relevant prior art.[19] Like the Asserted Patents and the Activity Rings, Brown features concentric arcs with curved endpoints:

---

[19] Plaintiff contests Brown's prior art status, stressing that Brown was published after the Asserted Patents' alleged July 2012 priority date. Pl. Br. at 20. This argument misunderstands

| '802 Patent | Accused Activity Rings Configuration | USD688,700 (Fig. 1).[20] Prior Art |
|---|---|---|
| | | |
| '808 Patent | Accused Activity Rings Configuration | USD688,700 (Fig. 1) Prior Art |
| | | |

In comparing the three categories of design, the Court is mindful that "where a dominant feature of the patented design and the accused products . . . appears in the prior art, the focus of the infringement substantial similarity analysis in most cases will be on other features of the design. The shared dominant feature from the prior art will be no more than a background feature of the design, necessary for a finding of substantial similarity but insufficient by itself to support a finding of substantial similarity." *ABC Corp.*, 52 F.4th at 942. The general conceptual similarity among the three designs — that is, that all three feature concentric arcs with curved end points — therefore serves as nothing more than a background feature, and the analysis focuses instead on the relative configurations of those arcs. In that respect, if anything, Brown

the law. "[U]nder § 102(e)(1) [of the Patent Act], even if a patent application was *published* after a claimed invention, it may serve as prior art to the invention if the application was *filed* before the invention." *Lynk Labs, Inc. v. Samsung Elecs. Co.*, 125 F.4th 1120, 1126 (Fed. Cir. 2025), *cert. denied*, 2026 WL 642821 (U.S. Mar. 9, 2026).

[20] Pipe Report at 95, 124.

shares more similarities with the Asserted Patents than do the Activity Rings.  Namely, both Brown and the Asserted Patents have more discernible spacing between their arcs, which reduces the sense of cohesion among the arcs and alters the observer's perception of the arcs' range of motion (*i.e.*, outward rather than clockwise).  Consideration of the prior art therefore only further reveals the narrow scope of the Asserted Patents.  *Cf.* '802 Notice at 8 (patent examiner concluding that "the specific size, curvature and position of the segments together" distinguishes the Asserted Patent from the prior art, and that "the [patent] is understood to seek no protection for any deviation of form in any of these lines and composition"); Memo at 5-6 (Plaintiff's former counsel opining that prior art could "narrow the scope of protection [Plaintiff would] receive to the point that it [would] not cover the Apple Watch").

In conclusion, even though the Asserted Patents, Activity Rings, and prior art share the features of concentric two- or three-arc designs with rounded ends, "[s]imilarity at this conceptual level . . . is not sufficient to demonstrate infringement of the claimed designs." *Ethicon*, 796 F.3d at 1336.  Plaintiff, through his expert, asserts that the Asserted Patents are distinct from the prior art because of the specific configurations of the arcs.  But those differences in configuration would likewise distinguish the Activity Rings from the Asserted Patents in the eyes of an ordinary observer.  The Court therefore concludes that when the proper, limited scope of the Asserted Patents is compared to the Activity Rings, the designs, viewed as a whole, are not substantially similar in form or overall composition.  Thus, no reasonable juror could find that the Activity Rings infringe the Asserted Patents, and Apple's motion for summary judgment on non-infringement is accordingly granted.

## II.    Invalidity

In addition to non-infringement, Apple seeks summary judgment on the question of invalidity.  Specifically, Apple argues that Shunock's asserted priority claim fails for (1) lack of

47

written description support for what Apple identifies as later-claimed arc "sub-combinations" in the Asserted Patents, and (2) lack of an overlapping inventor between Shunock PCT and the Asserted Patents. Def. Br. at 27-31. Absent the priority claim, Shunock PCT would be prior art to the Asserted Patents, rendering them invalid. *Id.* at 27. Pointing to its own summary judgment briefing contesting a finding of invalidity, Plaintiff replies that the Asserted Patents are entitled to their priority claim as a matter of law. Pl. Opp. at 37 (citing Pl. Br. at 43-45); *see also* Pl. Br. at 46-47 (addressing inventorship argument).

Having granted Apple's motion for summary judgment on non-infringement, the Court dismisses as moot and without prejudice Apple's counterclaims for invalidity — and accordingly dismisses as moot each party's motion for summary judgment on Apple's invalidity defenses. *See, e.g.*, *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998) ("[A] district court has discretion to dismiss a counterclaim alleging that a patent is invalid as moot where it finds no infringement."); *Nystrom v. TREX Co.*, 339 F.3d 1347, 1351 (Fed. Cir. 2003) ("[T]he district court could have dismissed the counterclaim without prejudice (either with or without a finding that the counterclaim was moot) following the grant of summary judgment of non-infringement."); *In re Fenofibrate Pat. Litig.*, 910 F. Supp. 2d 708, 709-10 (S.D.N.Y. 2012) ("[T]he Court concludes that the defendants' motions for summary judgment of noninfringement should be granted. Having granted those motions, the Court dismisses as moot defendants' counterclaims for invalidity, and therefore the Court does not reach the defendants' related motions for summary judgment of invalidity."), *aff'd*, 499 F. App'x 974 (Fed. Cir. 2013); *see also* Dkt. 290 (agreeing that "[t]his Court has the legal authority to dismiss" Defendant's invalidity counterclaims as moot (internal quotation marks and citation omitted)).

As for Plaintiff's requested relief of "[a] judgment that each of [his] asserted patents is valid and enforceable," Compl. at 38, "[i]t is neither necessary nor appropriate for a court to

48

declare a patent valid," *Stand. Mfg. Co., Inc. v. U.S.*, 25 Cl. Ct. 1, 49 (1991) (quoting *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1569 (Fed. Cir. 1987)); *see also Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1377 (Fed. Cir. 2024) ("[I]n a court proceeding, a patent is not found 'valid.'  Rather, when a patent owner prevails in the face of an invalidity defense or counterclaim, it merely means that the patent challenger has failed to carry its burden." (citation omitted)).  Plaintiff's request is therefore denied.

## III.    *Daubert* Motions

The parties' *Daubert* motions are likewise dismissed as moot because the Court has resolved the motion on summary judgment.  *Ritchie v. N. Leasing Sys., Inc.*, No. 12-cv-4992 (KBF), 2016 WL 1241531, at *22 (S.D.N.Y. Mar. 28, 2016) ("Because the Court has resolved the case on summary judgment, defendants' *Daubert* motion and motions *in limine* are moot."); *Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 581 (2d Cir. 1993) (observing that motions *in limine* are moot where court grants summary judgment); *see, e.g.*, *Velez v. Lasko Prods., LLC*, No. 22-cv-08581 (JLR), 2025 WL 1865165, at *1 (S.D.N.Y. July 7, 2025) (granting summary judgment and denying *Daubert* motion as moot); *Evans Med. Ltd. v. Am. Cyanamid Co.*, 11 F. Supp. 2d 338, 373 (S.D.N.Y. 1998) (same), *aff'd*, 215 F.3d 1347 (Fed. Cir. 1999); *Allen v. City of New York*, No. 19-cv-03786 (JMF), 2024 WL 3965697, at *1 (S.D.N.Y. Aug. 28, 2024) (same), *aff'd*, 2025 WL 3152723 (2d Cir. Nov. 12, 2025) (summary order).

## IV.    Motions to Seal

As a final matter, the Court notes that Defendant has requested that certain documents filed in connection with the parties' motions be sealed or redacted.  Dkts. 191, 261.  Specifically, Defendant seeks to redact around eighty documents and seal seven, Dkt. 191, with proposed revised redactions to two previously redacted documents, Dkt. 261.

"Judicial documents are subject at common law to a potent and fundamental presumptive right of public access[.]" *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022) (quoting *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020)). In *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), the Second Circuit articulated a three-step test for district courts to decide whether a filing can remain under seal. *Id.* at 119. First, the Court must "conclude that the documents at issue are indeed 'judicial documents,'" meaning that the item is "relevant to the performance of the judicial function and useful in the judicial process." *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)). Second, the Court "determine[s] the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)). Third, the Court is directed to weigh the presumption of public access attached to the document against the countervailing factors. *Id.* at 120. Those factors may include the "need to protect sensitive commercial information from disclosure to competitors seeking an advantage," *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, Nos. 14-md-02532 (VSB), 14-mc-02542 (VSB), 2023 WL 196134, at *3 (S.D.N.Y. Jan. 17, 2023) (quoting *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, Nos. 14-md-02542 (VSB), 14-mc-02542 (VSB), 2014 WL 12772236, at *2 (S.D.N.Y. Nov. 5, 2014)), and "the privacy interests of innocent third parties," *id.* at *4 (quoting *In re Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990)). These considerations, however, "must be concretely and specifically described." *Id.*

"[D]ocuments submitted to a court for its consideration in a summary judgment motion are — as a matter of law — judicial documents to which a strong presumption of access attaches," and such documents "should not remain under seal absent the most compelling reasons." *Lugosch*, 435 F.3d at 121 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

50

Thus, the first two *Lugosch* factors weigh in favor of denying the motions to seal.  However, the documents at issue implicate considerable countervailing factors, as they include "Apple's confidential internal process for product design, Apple's confidential financial information, Apple's confidential licenses, and certain third-party private information."  Dkt. 191 at 1; *see also* Dkt. 261 at 1.  As required, Apple has articulated a "particularized showing of need" and offered redactions that are "narrowly tailored to accomplish the overriding interest."  *United States v. King*, No. 10-cr-00122 (JGK), 2012 WL 2196674, at *2 (S.D.N.Y. June 15, 2012); *see, e.g.*, *Banyan v. Sikorski*, No. 17-cv-04942 (JLR), 2024 WL 2136673, at *1 (S.D.N.Y. May 13, 2024) (approving redactions that were "narrowly tailored in scope").

First, Apple seeks to redact — and, in four instances, seal — information concerning the Apple Watch design process, which, even within the company, was known to only a select group of people.  Dkt. 191 at 2.  Where, as here, "publicly revealed, sensitive business information could undercut [Apple]'s competitive advantage . . . , courts routinely find that business secrecy interests outweigh the presumption of public access[.]"  *Brunckhorst v. Bischoff*, No. 21-cv-04362 (JPC), 2024 WL 4276201, at *2-3 (S.D.N.Y. Sept. 24, 2024) (granting motion to seal "sensitive business information" submitted at summary judgment); *see, e.g.*, *Kewazinga Corp. v. Microsoft Corp.*, No. 18-cv-04500 (GHW), 2021 WL 1222122, at *6 (S.D.N.Y. Mar. 31, 2021) (sealing Microsoft's confidential and proprietary business information given that "if that information were to be disclosed, it could indeed harm Microsoft or advantage its competitors"); *cf. News Corp. v. CB Neptune Holdings, LLC*, No. 21-cv-04610 (VSB), 2021 WL 3409663, at *2 (S.D.N.Y. Aug. 4, 2021) (ordering redactions because the "competitive disadvantages that would flow to Neptune if such information were disclosed outweighs the general public interest in disclosure").  Defendant's request to redact information relating to the Apple Watch design process is therefore granted, with two exceptions.  Because Apple designers' referral to swipe

during the Activity Rings design process is central to Plaintiff's willfulness allegations, and this Court's related ruling, discussions of the role of swipe in the Activity Rings design process play a more significant role in "the exercise of Article III judicial power" than other statements relating to the Apple Watch design process more generally.  *Lugosch*, 435 F.3d at 119. Likewise, the Court's specific reliance on draft Activity Rings designs in this Opinion, *see supra* Section I.C, renders those cited images more central to the Court's exercise of its judicial power. Given the heightened "resultant value of such information to those monitoring the federal courts," *Lugosch*, 435 F.3d at 119, the Court finds that the first and second *Lugosch* factors outweigh Defendant's proffered countervailing factor in those two contexts.  Indeed, Defendant seems to concede as much, as it did not redact references to the draft Activity Rings designs or the swipe process in later filings.  *See, e.g.*, Pipe Rebuttal Report at 260 (showing non-redacted draft Activity Rings design); Def. Reply at 12 (discussing swipe's role in the Activity Rings design process and quoting, in non-redacted form, the redacted portion of a deposition transcript discussing swipe).  Defendant's motion to seal at Dkt. 191 is therefore denied solely as to (1) discussions regarding the role of swipe in the Activity Rings design process and (2) the draft Activity Rings designs cited herein.

Second, Apple seeks to redact information concerning Apple's financial data, usage data, surveys, and licenses, as well as deposition testimony about the same.  Dkt. 191 at 2.  Like the Federal Circuit in *Apple Inc. v. Samsung Electronics Co.*, the Court finds that Apple's care to limit its request "to a small subset of the documents" and its disclosure of "less-detailed financial information" for purposes of the (now moot) damages analysis supports granting the sealing motion here.  727 F.3d 1214, 1225-26 (Fed. Cir. 2013); *see also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (granting redactions "limited to specific business information and strategies, which, if revealed, 'may provide valuable insights

into a company's current business practices that a competitor would seek to exploit'" (citation omitted)); *PharmacyChecker.com LLC v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19-cv-07577 (KMK), 2022 WL 4956050, at *2 (S.D.N.Y. Aug. 26, 2022) ("[C]ourts have consistently found that confidential commercial information of a business — including confidential research, internal business documents and information about a business's operations are the proper subject of sealing."); *Rubik's Brand Ltd. v. Flambeau, Inc.*, No. 17-cv-06559 (PGG) (KHP), 2021 WL 1085338, at *1 (S.D.N.Y. Mar. 22, 2021) (sealing licensing information at summary judgment because "[d]isclosure of th[e] contractual terms could . . . disadvantag[e] [plaintiff] in negotiating future licensing agreements").

Lastly, because the "privacy interests of third parties" are sufficient to "outweigh[] the presumption of public access," *N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*, 710 F. Supp. 3d 183, 211 (S.D.N.Y. 2024), the Court likewise grants Defendant's requests to seal Gottschalk's private information, Dkt. 191, and to redact the private details of the third-party disputes identified in Dr. Sun's *curriculum vitae*, Dkt. 261. *See, e.g.*, *Farrell v. City of New York*, No. 23-cv-04329 (JLR), 2023 WL 3936725, at *2 (S.D.N.Y. June 9, 2023) (granting "request to redact personal identifying information (and other 'sensitive information')"); *In re Keurig*, 2023 WL 196134, at *4 ("[T]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation" (internal quotation marks and citation omitted)).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to non-infringement and DENIED as moot without prejudice as to invalidity. Plaintiff's motion for partial summary judgment on invalidity, as well as the parties' *Daubert* motions, are likewise DENIED as moot.

Defendant's motion to seal at Dkt. 191 is GRANTED in part and DENIED in part. By **April 10, 2026**, the parties are ordered to refile any document that (1) discusses the role of swipe in the Activity Rings design process or (2) contains images of draft Activity Rings designs cited herein, with revised redactions consistent with this Opinion.

Defendant's motion to seal at Dkt. 261 is GRANTED. The Clerk of Court is directed to seal Dkts. 227-6 and 231-1, and Defendant is granted leave to file the further redacted public versions of those documents, currently at Dkts. 261-1 and 261-2.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 137, 141, 145, 147, 154, 157, 191, and 261, and CLOSE this case.

Dated: March 25, 2026
New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge

54